**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAROLD BROWER, JUDI TALILI, and SAMUEL JIVIDEN, individually and on behalf of all others similarly situated, | Civil Action No. 16-cv-07318-AT-DCF |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| WELSPUN INDIA LTD. and WELSPUN USA, INC., | |
| Defendants. | |

Plaintiffs Harold Brower, Judi Talili, and Samuel Jividen ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Welspun India Ltd. and its subsidiary Welspun USA Inc. (collectively, "Welspun" or "Defendants"). Plaintiffs make the following allegations based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.      This is a class action against one of the world's largest textile companies and its U.S. subsidiary for distributing, marketing and selling bed linens that, despite being labeled as "100% Egyptian cotton," were not 100% Egyptian cotton. Egyptian cotton linens command a premium in the market due to their superior quality, durability, and association with luxury products. Welspun's "100% Egyptian" cotton linens, however, are made with less expensive and inferior non-Egyptian cotton, and are pawned-off to consumers at a substantial premium over other cotton linens that are not labeled 100% Egyptian cotton.

2.      On August 22, 2016, shortly after Welspun's fraud was first uncovered and publicized in the Wall Street Journal and other news organizations, Welspun's Managing Director publicly admitted at an investor meeting that "without any ambiguity the fault is on our side," and that Welspun must "take responsibility for it."

3.      Labeling a product as "100% Egyptian cotton" when it is made from other types of cotton violates federal and state laws, including the Textile Fiber Products Identification Act, 15 U.S.C. § 70 *et seq*., which prohibits companies from misrepresenting the origin of cotton in cotton products.

4.      Because Plaintiffs and the proposed class members have been damaged by Welspun's false labeling, Plaintiffs bring this action seeking, for themselves and all other similarly situated purchasers of Welspun linen products, compensatory damages, restitution, injunctive relief, and punitive damages.

## THE PARTIES

5.      Plaintiff Harold Brower is a citizen of California, residing in Escondido.  In or about March 2016, Mr. Brower purchased Fieldcrest linens labeled "100% Long Staple Egyptian Cotton" from Target.  Prior to purchasing the bed linens, Mr. Brower reviewed the product packaging, which prominently stated on the front of the package that the product was "100% Long Staple Egyptian cotton."  Mr. Brower read and relied on the representation that the bed linens were made from 100% Long Staple Egyptian cotton, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton.  Mr. Brower relied on these representations and warranties in deciding to purchase the bed linens, and he would not have purchased the product if he had known that the product was not 100% Long Staple Egyptian cotton.  Mr. Brower purchased the product at a substantial price premium expecting that they would be made from 100% Long Staple Egyptian cotton.  He also understood that in making the sale, the retailer was acting with knowledge and approval of Defendants and/or as the agent of Defendants.  He also understood that the purchase involved a direct transaction between himself and Defendants, because his purchase came with Defendants' representation that the product was, in fact, 100% Long Staple Egyptian cotton.

6.      Plaintiff Judi Talili is a citizen of California, residing in Santa Ana.  In or about 2014, Ms. Talili purchased Fieldcrest linens labeled "100% Long Staple Egyptian Cotton" from Bed Bath and Beyond.  Prior to purchasing the bed linens, Ms. Talili reviewed the product packaging, which prominently stated on the front of the package that the product was "100%

Long Staple Egyptian cotton." Ms. Talili read and relied on the representation that the bed linens were made from 100% Long Staple Egyptian cotton, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton. Ms. Talili relied on these representations and warranties in deciding to purchase the bed linens, and she would not have purchased the product if she had known that the product was not 100% Long Staple Egyptian cotton. Ms. Talili purchased the product at a substantial price premium expecting that they would be made from 100% Long Staple Egyptian cotton. She also understood that in making the sale, the retailer was acting with knowledge and approval of Defendants and/or as the agent of Defendants. She also understood that the purchase involved a direct transaction between herself and Defendants, because her purchase came with Defendants' representation that the product was, in fact, 100% Long Staple Egyptian cotton.

7.     Plaintiff Samuel Jividen is a citizen of New York, residing in Rochester. Mr. Jividen purchased Fieldcrest linens labeled "100% Long Staple Egyptian Cotton" from Bed Bath and Beyond twice: once in approximately June 2015, and later in approximately April 2016. Prior to purchasing the bed linens, Mr. Jividen reviewed the product packaging, which prominently stated on the front of the package that the product was "100% Long Staple Egyptian cotton." Mr. Jividen read and relied on the representation that the bed linens were made from 100% Long Staple Egyptian cotton, and understood them to be representations and warranties that the product was, in fact, made only of Egyptian cotton. Mr. Jividen relied on these representations and warranties in deciding to purchase the bed linens, and he would not have purchased the product if he had known that the product was not 100% Long Staple Egyptian cotton. Mr. Jividen purchased the product at a substantial price premium expecting that they would be made from 100% Long Staple Egyptian cotton. He also understood that in making the sale, the retailer was acting with knowledge and approval of Defendants and/or as the agent of Defendants. He also understood that the purchase involved a direct transaction between himself and Defendants, because his purchase came with Defendants' representation that the product was, in fact, 100% Long Staple Egyptian cotton.

8.     Defendant Welspun India Ltd. is a textile company based in Mumbai, India.  It is one of the world's largest textile manufacturers.  More than 68 percent of its production is exported to the United States.

9.     Defendant Welspun USA Inc. is a textile company and wholly owned subsidiary of Welspun India Ltd.  It is a Delaware company with its principal place of business at 295 5th Ave., New York, NY 10016.  Upon information and belief, Welspun USA Inc. does business throughout the United States and within this District.

10.     Defendants market and distribute bed linens throughout California, New York, and the United States.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and because members of the proposed class are citizens of a state different from the state of Defendants.

12.     Venue is proper in this District under 28 U.S.C. § 1331(a) because a substantial part of the events, omissions and acts giving rise to the claims herein occurred in this District. Defendant Welspun USA's principal place of business is in this District.  Moreover, Defendants distributed, advertised and sold linens mislabeled as "100% Egyptian cotton," which is the subject of this lawsuit, in this District.

## FACTS COMMON TO ALL CAUSES OF ACTION

### I.     Egyptian Cotton Is Prized For Its Durability, Softness And Quality

13.     Egyptian cotton is considered some of the highest-quality cotton in the world.  A combination of climate and cultivation methods used in Egypt result in Egyptian cotton having longer cotton fibers (or "staples") than other types of cotton.  In general, the longer the fiber, the more high quality the fabric because longer fibers translate into more uninterrupted fiber to use when making yarn and threads.  This feature results in fewer splices and a stronger, more durable

fabric.  Standard cotton sheets, in contrast, use shorter fibers that are twisted and combined to produce the right length—a process that results in a weaker weave and a product that is more susceptible to wear, tear and shredding.

14.     Longer fibers also generate finer yarn, which in turn allows manufacturers to pack more thread counts into each square inch.  Hence, Egyptian cotton linens are softer and more lustrous than linens made of other types of cotton.

15.     Egyptian cotton also is more porous than regular cotton, which makes Egyptian cotton sheets more comfortable to sleep on than standard cotton or polyester sheets because they absorb moisture better.  Egyptian cotton also absorbs dye more thoroughly than regular cotton, allowing for richer colors that resist fading longer.

16.     100% Egyptian cotton linens are widely regarded as the highest-quality option on the market when it comes to high-end linens, and consumers pay a substantial premium for 100% Egyptian cotton linens.

17.     Although cotton is one of Egypt's most well-known exports, only a small percentage of all cotton produced in the world comes from Egypt.  That percentage has steadily declined over the last decade due to reductions in government subsidies, and recent economic and political instability has exacerbated the problem.  According to a U.S. Department of Agriculture report, cotton production in Egypt experienced a "jaw-dropping decline" of 50 percent in 2016, compared to 2015.[1]  With the supply of Egyptian cotton dwindling, unscrupulous businesses have resorted to pawning-off non-Egyptian cotton as Egyptian cotton. The Cotton Egypt Association, a non-profit trade association in Egypt, reports that it conducted random DNA tests of home textiles sold in retail stores in the United States and other countries, and that 90 percent of the products tested contained no Egyptian cotton, despite being labeled as such.

---

[1] Beyond All Expectations:  Egypt's 2016 Cotton Production Set to Plummet.  U.S.D.A. Foreign Agricultural Service, June 7, 2016, *available at* http://gain.fas.usda.gov/R ecent%20GAIN%20Publications/Beyond%20All%20Expectations%20Egypt%E2%80%99s%20 2016%20Cotton%20_Cairo_Egypt_6-7-2016.pdf

II.     **Mislabeling Cotton As "Egyptian Cotton" Violates The Textile Fiber Products Identification Act And Federal Regulations Governing The Labeling Of Cotton Products**

18.     The Textile Fiber Products Identification Act ("Textile Act"), 15 U.S.C. § 70 *et seq*., governs labeling and advertising of textile products, and provides:

> The introduction, delivery for introduction, manufacture for introduction, sale, advertising, or offering for sale, in commerce, or the transportation or causing to be transported in commerce, or the importation into the United States, of any textile fiber product which is misbranded or falsely or deceptively advertised . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

15 U.S.C. § 70a(a).

19.     The Textile Act further provides:

> The sale, offering for sale, advertising, delivery, transportation, or causing to be transported, of any textile fiber product which has been advertised or offered for sale in commerce, and which is misbranded or falsely or deceptively advertised    . . . is unlawful, and shall be an unfair method of competition and an unfair and deceptive act or practice in commerce under the Federal Trade Commission Act [15 U.S.C.A. § 41 et seq.].

*Id.* § 70a(b).

20.     Under the Textile Act, the term "textile fiber product" includes "any household textile article made in whole or in part of yarn or fabric." *Id.* § 70(h)(3).  Cotton linen is a "textile fiber product" within the meaning of the Textile Act.

21.     The Textile Act further provides that a textile fiber product "shall be misbranded if it is falsely or deceptively stamped, tagged, labeled, invoiced, advertised, or otherwise identified as to the name or amount of constituent fibers contained therein."  *Id.* § 70b(a).

22.     The Federal Trade Commission ("FTC") has promulgated rules governing the labeling of textile products.  Under 16 C.F.R. § 303.16(a), a label must disclose the "generic name" of the constituent fibers of a product (such as "cotton").  Under 16 C.F.R. § 303.16(d), additional descriptive terms (such as "Egyptian cotton") may be included on the label, but only if they are "non-deceptive" and "are properly and truthfully descriptive" of the fiber used in the

6

product.  Under 16 C.F.R. § 303.27, "the word 'All' or the term '100%' may be used in labeling, together with the correct generic name of the fiber and any qualifying phrase [i.e., 100% Egyptian cotton]," only if the product "is comprised wholly" of that fiber.

**III.    Welspun Markets And Sells Bed Linens Labeled As "100% Egyptian Cotton" In Major Retailers Across The United States**

23.    Welspun markets and sells linens in the United States under the Fieldcrest, Crowning Touch, Better Homes & Gardens, and Canopy brands, among others.  Welspun brands are sold online and in major retail stores across the United States, including Target, Walmart, JCPenney, and Bed Bath & Beyond.  Included among Welspun's products are bed linens purportedly made from "100% Egyptian cotton" or "100% Long Staple Egyptian Cotton" (the "Affected Bed Linens").  The Affected Bed Linens include the following products:[2]

a.  Fieldcrest "100% Long-Staple Egyptian Cotton" bed linens;

b.  Better Homes and Gardens "100% Egyptian Cotton" bed linens;

c.  Canopy "100% Egyptian Cotton" bed linens; and

d.  Crowning Touch "100% Egyptian Cotton" bed linens.

24.    The Affected Bed Linens are all substantially similar.  Each product prominently displays the words "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton" on its packaging.  But each is made of non-Egyptian cotton.  Accordingly, each Affected Bed Linen is misrepresented as "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton."

---

[2] It is expected that additional Affected Bed Linens will be identified upon further investigation and discovery.

25.    For example, the front packaging of Fieldcrest brand linens purportedly made from Egyptian cotton uniformly states "100% Long-Staple Egyptian Cotton:"



26.    As does the front packaging of Better Homes and Gardens brand linens purportedly made from Egyptian cotton.  Its label uniformly states "Egyptian Cotton," and again in the lower front portion of the packaging "100% Egyptian Cotton:"



27.    The front packaging of Canopy brand linens purportedly made from Egyptian cotton also uniformly states "100% Egyptian Cotton:"



28.     Crowning Touch and other Affected Bed Linens are also labeled "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton" on the front packaging.

29.     By marketing and labeling the Affected Bed Linens as "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton," Welspun was able to sell the Affected Bed Linens at a significant premium compared to bed linens not labeled as "100% Egyptian cotton" or "100% Long Staple Egyptian Cotton."

**IV.     Welspun Admitted That It Sold Products That Were Mislabeled "100% Egyptian Cotton" And That It Must "Take Responsibility For It"**

30.     Sometime prior to August 2016, Target began an investigation into whether Welspun substituted non-Egyptian cotton in its Fieldcrest label bed linens sold in Target stores. On August 19, 2016, Target announced that it had confirmed that "Welspun substituted another type of non-Egyptian cotton when producing [Fieldcrest] bed linens between August 2014 and July 2016." Target also announced that it was terminating its relationship with Welspun and phasing out all Welspun products.

31.     In the wake of Target's announcement, other major U.S. retailers began their own investigations into whether sheets they buy from Welspun contain Egyptian cotton. On September 9, 2016, Walmart announced that it too would stop selling Egyptian cotton sheets made by Welspun and donate all of the sheets currently on its shelves.

32.     In response to these retailers' announcements, Welspun admitted to its unlawful conduct.  At an August 22, 2016, call with investors, Welspun's Managing Director Rajesh Mandawewala responded in the wake of the Target announcement that, "without any ambiguity the fault is on our side and so it is, let's say, the error is from our side so I guess we have to take responsibility for it."

## CLASS ACTION ALLEGATIONS

33.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased Affected Bed Linens that were manufactured or distributed by one or more Defendants and labeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton." Excluded from the Class are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased Affected Bed Linens for resale, the Judge(s) assigned to this case.

34.     Plaintiffs also seek to represent a California Subclass defined as all persons in California who purchased Affected Bed Linens that were manufactured or distributed by one or more Defendants and labeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  Excluded from the California Subclass are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased Affected Bed Linens for resale, the Judge(s) assigned to this case.

35.     Plaintiffs also seek to represent a New York Subclass defined as all persons in New York who purchased Affected Bed Linens that were manufactured or distributed by one or more Defendants and labeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  Excluded from the New York Subclass are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased Affected Bed Linens for resale, the Judge(s) assigned to this case.

36.     The members of the Classes are so numerous and widely dispersed that joinder of all members is impracticable.  On information and belief, millions of Class members have purchased bed linens mislabeled as "100% Egyptian Cotton" or "100% Long-Staple Egyptian Cotton."  The precise number of Class members and their identities are unknown to Plaintiffs at

this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Welspun and third party retailers and vendors.

37.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

      a.   Whether Defendants breached an express warranty made to Plaintiffs and the Class;

      b.   Whether Defendants advertised or marketed Affected Bed Linens in a way that was false or misleading;

      c.   Whether Defendants' conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

      d.   Whether Class members have been injured by Defendants' conduct;

      e.   Whether Class members suffered an ascertainable loss as a result of Defendants' misrepresentations;

      f.   Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

      g.   Whether Defendants violated California Civil Code §§ 1750, *et seq.*;

      h.   Whether Defendants violated California Business & Professions Code §§ 17200, *et seq.*;

      i.   Whether Defendants violated California Business & Professions Code §§ 17500, *et seq.*

      j.   Whether Defendants violated New York General Business Law § 349; and

      k.   Whether Defendants violated New York General Business Law § 350.

38.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs purchased one or more Affected Ben Linens.

39.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class or Subclass members they seek to represent.  Plaintiffs

also have retained competent counsel experienced in prosecuting class actions, and intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

40.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  The monetary value of each individual Class member's claim is small compared to the burden and expense of individual litigation.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Judicial economy is served by litigating the Class claims in one case.

## COUNT I
### Violation Of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*

41.     Plaintiffs Brower and Talili hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

38.     Plaintiffs Brower and Talili bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

39.     Plaintiffs Brower and Talili and the California Subclass members are consumers who purchased Affected Bed Linens for personal, family or household purposes.  Plaintiffs and the California Subclass members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

40.     The Affected Bed Linens that Plaintiffs and other California Subclass members purchased from Defendants were "goods" within the meaning of Cal. Civ. Code § 1761(a).

41.     Defendants' actions, representations, and conduct have violated and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

42.     Cal. Civ. Code § 1770(a)(4), prohibits "using deceptive representations or designations of geographic origin in connection with goods or services."  Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have …."  Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

43.     Defendants violated Cal. Civ. Code § 1770(a)(4), (a)(5) and (a)(9) by misrepresenting that the Affected Bed Linens were made with "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton," as alleged herein.

44.     Plaintiffs Brower and Talili and the California Subclass suffered injuries caused by Defendants because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from 100% Egyptian cotton or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

45.     On or about September 19, 2016, prior to filing this action, a CLRA notice letter was served on Defendants which complies in all respects with California Civil Code § 1782(a). Plaintiffs Brower and Talili sent Defendants a letter via certified mail, return receipt requested, advising Defendants that they are in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom. A true and correct copy of Plaintiffs' letter is attached hereto as Exhibit A.

46.     Wherefore, Plaintiffs Brower and Talili seek damages, restitution, and injunctive relief for this violation of the CLRA.

**COUNT II**
**Violation Of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***

47.     Plaintiffs Brower and Talili hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

48.     Plaintiffs Brower and Talili bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

49.     Defendants are subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

50.     Defendants violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, the Textile Act, and 16 C.F.R. §§ 303.16(d) and § 303.27, as alleged herein.

51.     Defendants' misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

52.     Defendants violated the "fraudulent" prong of the UCL by making misrepresentations that the Affected Bed Linens were made from "100% Egyptian cotton or "100% Long-Staple Egyptian Cotton," as described herein.

53.     Plaintiffs Brower and Talili and the California Subclass lost money or property as a result of Defendants' UCL violations because: because: (a) they would not have purchased the Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from 100% Egyptian cotton or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100%

Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

**COUNT III**
**Violation Of California's False Advertising Law ("FAL"),**
**California Business & Professions Code §§ 17500, *et seq.***

54.    Plaintiffs Brower and Talili hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

55.    Plaintiffs Brower and Talili bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

56.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

57.    Defendants committed acts of false advertising, as defined by §§17500, *et seq.,* by misrepresenting that Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."

58.    Defendants knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that their representations about the Affected Bed Linens were untrue and misleading.

59.    Defendants' actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

60.    Plaintiffs Brower and Talili and the California Subclass lost money or property as a result of Defendants' FAL violations because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price

premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT IV
### Breach Of Express Warranty

60.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

61.     Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

62.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, expressly warranted that the Affected Bed Linens were "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."

63.     In fact, the Affected Bed Linens do not conform to the express warranty because they are not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."

64.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiffs and Class members have been injured and harmed because:  (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT V
### Breach Of The Implied Warranty Of Merchantability

65.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

66.     Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

67.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Affected Bed Linens were "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."

68.     As a direct and proximate cause of Defendants' breach of implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

69.     Plaintiffs and Class members purchased the Affected Bed Linens in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

70.     The Affected Bed Linens were not altered by Plaintiffs or Class members.

71.     The Affected Bed Linens were defective when they left the exclusive control of Defendants.

72.     Defendants knew that the Affected Bed Linens would be purchased and used without additional testing by Plaintiffs and Class members.

73.     The Affected Bed Linens were defectively designed and unfit for their intended purpose, and Plaintiffs and Class members did not receive the goods as warranted.

74.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100%

17

Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT VI
### Unjust Enrichment

75.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

76.    Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

77.    Plaintiffs and Class members conferred benefits on Defendants by purchasing the Affected Bed Linens.

78.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of the Affected Bed Linens.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."  These misrepresentations caused injuries to Plaintiffs and Class members because they would not have purchased the Affected Bed Linens on the same terms if the true facts were known.

79.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and Class members for their unjust enrichment, as ordered by the Court.

## COUNT VII
### Negligent Misrepresentation

80.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

81.    Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

82.    As discussed above, Defendants misrepresented that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton."

83.     At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

84.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about the Affected Bed Linens.

85.     The negligent misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Affected Bed Linens.

86.     Plaintiffs and Class members would not have purchased the Affected Bed Linens on the same terms if the true facts had been known.

87.     The negligent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

<u>**COUNT VIII**</u>
**Fraud**

88.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

89.     Plaintiffs bring this claim individually and on behalf of the proposed Class against Defendants.

90.     As discussed above, Defendants provided Plaintiffs and Class members with false or misleading material information and failed to disclose material facts about Affected Bed Linens, including by misrepresenting that the Affected Bed Linens were "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton" linens and failing to disclose that they were not "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton." These misrepresentations and omissions were made with knowledge of their falsehood.

91.     The misrepresentations and omissions made by Defendants, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase the Affected Bed Linens.

92. The fraudulent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

### COUNT IX
### Violation Of The Magnuson-Moss Warranty Act,
### 15 U.S.C. §§ 2301, *et seq.*

60. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

61. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against all Defendants.

62. The Affected Bed Linens are consumer products as defined in 15 U.S.C. § 2301(1).

63. Plaintiffs and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

64. Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

65. In connection with the sale of the Affected Bed Linens, Defendants issued an implied warranty as defined in 15 U.S.C. § 2301(7), by making a false promise or affirmation on its container or label that Affected Bed Linens were "100% Egyptian Cotton" or "100% Long Staple Egyptian Cotton."

66. The Affected Bed Linens do not conform to the implied warranty because the implied warranty is false and misleading.

67. By reason of Defendants' breach of the implied warranty of merchantability, Defendants violated the statutory rights due Plaintiffs and the Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and members of the Class.

68. Plaintiffs and the Class members were injured as a direct and proximate result of Defendants' breach because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from 100% Egyptian

cotton or 100% Long-Staple Egyptian Cotton; (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

## COUNT X
### Violation Of New York Gen. Bus. Law § 349

69.     Plaintiff Jividen repeats the allegations in the foregoing paragraphs as if fully set forth herein.

70.     Plaintiff Jividen brings this Count X individually and on behalf of the members of the New York Subclass against all Defendants.

71.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Defendants.

72.     The foregoing deceptive acts and practices were directed at consumers.

73.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Affected Linen Products to induce consumers to purchase same.

74.     Plaintiff Jividen and members of the New York Subclass were injured and harmed because:  (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

75.     As a result of Defendants' false, misleading and deceptive statements and representations of fact, Plaintiff Jividen and members of the New York Subclass have suffered economic injury.

76.     Plaintiff Jividen and members of the New York Subclass suffered an ascertainable loss caused by Defendants' misrepresentations equal to the price premium they paid for the Affected Bed Linens.

77.     On behalf of himself and other members of the New York Subclass, Plaintiff Jividen seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

**COUNT XI**
**Violation Of New York Gen. Bus. Law § 350**

78.     Plaintiff Jividen repeats the allegations in the foregoing paragraphs as if fully set forth herein.

79.     Plaintiff Jividen brings this Count XI individually and on behalf of the members of the New York Subclass against all Defendants.

80.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices for the purpose of generating retail sales which could and did increase the amount of wholesale sales to Defendants.

81.     Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

82.     Defendants' false, misleading and deceptive statements and representations of fact were and are directed to consumers.

83.     Defendants' false, misleading and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

84.     Defendants' false, misleading and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

85.     Plaintiff Jividen and members of the New York Subclass were injured because: (a) they would not have purchased Affected Bed Linens on the same terms if they knew that the Affected Bed Linens were not made from "100% Egyptian cotton" or "100% Long-Staple

Egyptian Cotton;" (b) they paid a substantial price premium compared to non-Egyptian cotton linens due to Defendants' representations that the Affected Bed Linens were made from "100% Egyptian cotton" or "100% Long-Staple Egyptian Cotton;" and (c) the Affected Bed Linens did not have the characteristics, uses, or benefits as promised.

86.     As a result of Defendants' false, misleading and deceptive statements and representations of fact Plaintiff Jividen and members of the New York Subclass have suffered and continue to suffer economic injury.

87.     Plaintiff Jividen and members of the New York Subclass suffered an ascertainable loss caused by Defendants' misrepresentations equal to the price premium they paid for the Affected Bed Linens.

88.     On behalf of himself and other members of the New York Subclass, Plaintiff Jividen seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendants as follows:

a.  For an order certifying a the classes described herein under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Classes and Plaintiffs' attorneys as Class Counsel;

b.  For an order declaring that Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiffs, and the class members on all counts asserted herein;

d.  For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

23

g.  For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, and expenses;

h.  Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

i.  For injunctive relief enjoining the illegal acts detailed herein;

j.  For such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  October 28, 2016

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Joseph I. Marchese*
Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
Frederick J. Klorczyk III
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
jmarchese@bursor.com
fklorczyk@bursor.com

*Attorneys for Plaintiffs*